## MARTIN *v.* STATE, EX REL. EIDSON.

[No. 14,226.   Filed August 12, 1931.]

*John W. Kitch* and *William J. Reed,* for appellant.

*James M. Ogden,* Attorney-General, *George W. Hufsmith,* Deputy Attorney-General, and *H. E. Orr,* for the State.

NEAL, C. J.—This action was brought by the State of Indiana on the relation of Jacob W. Eidson, against appellant to abate a nuisance, under Acts 1925 p. 144, §§2740-2742 Burns 1926. Appellant filed a demurrer to the complaint, which was overruled, and he then filed an answer in general denial and two additional paragraphs of answer, to which two paragraphs of answer appellee replied, thereby closing the issues in the case. The court made a special finding of facts and stated its conclusions of law thereon and rendered judgment in favor of appellee and against appellant, adjudging the premises of appellant to be a nuisance and ordering the nuisance abated, that he be required to give bond operative for one year, and that he pay the costs of the action, including attorney fees of appellee's attorney. Appellant's motion for new trial being overruled, this appeal was taken, ap-

pellant assigning as error: (1) Overruling demurrer to complaint; (2) error in each of the conclusions of law; (3) the court's action in sustaining appellee's motion to hear evidence as to the reasonable value of appellee's attorney fees in the prosecution of the action; (4) overruling motion for new trial, under which it is presented: (a) The decision of the court is not sustained by sufficient evidence; (b) the decision is contrary to law; (c) error in the admission and exclusion of certain evidence.

No question is presented for our consideration as to the ruling on the demurrer, for the reason that appellant has failed to point out and discuss such question in the "Points and Authorities" portion of his brief. Under Rule 22 of the Supreme and Appellate Courts, appellant is required to group his propositions under a separate heading for each error relied on, and it is not sufficient that he state propositions of law which are not applied to the assignments of error. *Cleveland, etc., R. Co.* v. *Ritchey* (1916), 185 Ind. 28, 111 N. E. 913; *Baker* v. *Stehle* (1918), 187 Ind. 468, 119 N. E. 4. For the same reason, the questions as to the admission and exclusion of evidence are not presented, and, further, for the reason that appellant has failed to point out in his brief where the rulings thereon are to be found in the record. *Ex parte McAdams* (1925), 196 Ind. 184, 147 N. E. 764.

The assignment of error that the court erred in sustaining appellee's motion to hear evidence as to the reasonable value of appellee's attorney fees is also waived. Appellant has directed no point to this alleged error in the "Points and Authorities" portion of his brief. Abstract propositions of law not directed or applied to a specific assignment of error will not be considered on appeal. Furthermore, neither this motion, nor a copy thereof, nor the rulings thereon are set out in that portion of the brief denominated the

"Record"; therefore, no question on this motion is presented. Appellant is required to state so much of the record as fully presents every error and exception relied upon, referring to the pages and lines of the transcript. Rule 22, Supreme and Appellate Courts; *Bruner* v. *State* (1928), 201 Ind. 33, 164 N. E. 272.

This court, then, will consider only the remaining questions properly presented, viz.: (1) The decision of the court is not sustained by sufficient evidence and is contrary to law; (2) the conclusions of law are erroneous. We give appellant some benefit of the doubt as to these questions, for some of the points here made are merely abstract propositions of law not applied to any specific question of which complaint is made.

The findings of the court, in substance, are as follows: That for several years, appellant occupied a part of a building in Plymouth, Indiana, in which he operated a cigar store, pool room and soft drink parlor; that, for several years prior to June 30, 1928, appellant, in his place of business, manufactured a cider product composed of syrup, purchased from a certain fruit juice company, and water, which cider appellant or his agents mixed in kegs, which product would be permitted to remain for a time in the keg in such a manner that it was open to the air, after which time a quantity of the product would be transferred from the basement, where it was mixed, to the first floor of the premises, where it was sold at 10 cents a glass; that the syrup so sold to appellant was boiled-down cider and was represented by the company to be nonintoxicating; that, on June 30, 1928, the sheriff of Marshall County, by virtue of a search warrant, searched the premises occupied by appellant and found a quantity of the product so manufactured for sale and removed a jar of such product containing approximately two gallons; that the product so removed was in fact intoxicating, containing as much

or more than one-half of one per cent of alcohol by volume, to wit, 4.61 per cent; that, after the search, appellant received information that the cider product was found to contain more than the legal limit of alcohol, and not later than July 10, 1928, he returned the remaining syrup to the fruit juice company and poured out the cider product then on hand, and since that date has not manufactured or sold any of the cider product; that, on and prior to June 30, 1928, the place of business of appellant sustained a reputation as being a place where intoxicating liquor was possessed and sold and where poeple resorted for the purpose of drinking intoxicating liquor; that, prior to and since the date of the search, men in an intoxicated condition have frequented the place of business of appellant, with knowledge and permission of appellant, and prior to and since the date of the search, the appellant and his agents have, at sundry times, found and removed numerous empty bottles from the premises, which bottles were left there by divers persons; that appellant had intimate knowledge as to the condition existing in his place of business, and he has not been diligent in preventing such conditions; that, following the search by the sheriff, a criminal proceeding was instituted against appellant for possession of intoxicating liquor, and that the cause of the cessation of the manufacture and sale of the cider product by appellant was due to the search of the premises.

Upon these findings, the court rendered its conclusions of law, in substance, as follows: That the law is with the appellee, and that the premises occupied by appellant are a common nuisance and appellee has no adequate remedy at law; that appellee is entitled to an order perpetually enjoining appellant from manufacturing, selling, bartering, giving away, furnishing or otherwise disposing of intoxicating liquor on or in the premises occupied by him, and that he be further enjoined from per-

mitting people to resort to the premises for the purpose of drinking intoxicating liquor; that appellant be required to give a bond in the sum of $1,000 to the State of Indiana, with surety approved, conditioned that, for a period of one year, he will not violate the order against him; that appellee have and recover from appellant the costs of this action taxed at $...... There was also a statement in the conclusions that, if appellant failed in giving the bond, the court would appoint a receiver, but, on motion of appellant, this statement was stricken out.

Appellant contends that, since it was shown the nuisance as to the sale of the cider product was abated by the appellant himself, there was nothing left to abate, hence the decision is not sustained by sufficient evidence and it is, therefore, contrary to law. In considering this question, it will be necessary to set forth some of the evidence.

Appellant testified, in answer to a question as to thinning down the cider before serving: "Oh, I might, take if a 'tight' came in there, yes, sir, have fellows there 'tight' and wanted cider, added water to it, didn't want to argue with them, gave it to them to please them," and "We may have weakened it down some, some fellows come in 'tight,' come in with bottles, I have taken bottles out back in there of the room, several of them, take the fellows I was speaking of last, I didn't want them drunk in there, weakened it down—maybe they would want a glass of water. I would be glad to give them that." Further, in response to an inquiry concerning whether or not he had seen as many intoxicated there since the search, appellant stated: "I don't believe I have, there aren't as many bootleggers as there used to be, I know eight or ten bootleggers there, I remember eight or ten bootleggers since I have been there, now I only know two or three, I can make it a little bit

stronger." As to the amount of cider sold, appellant said: "I sold quite a bit because I kept it on ice, lots of fellows liked cider as well as root beer, I could not tell you exactly the amount I sold. Oh, I would say from six to seven gallon, maybe, in one day."

Ernest Conklin, employee of appellant, testified that he mixed the cider and water in a keg "with the bung in the barrel at the top which was open part of the time and closed part of the time. We let it stand three or four days before selling any of it and we took it upstairs in gallon jugs."

Adam Zehner, also an employee of appellant, said that, since June 30, 1928, the date of the search, he had seen intoxicated folks in there and they came in with different degrees of intoxication; that "either the heat after they came in or the drinking of liquor which they brought with them made them appear more intoxicated on leaving than when they came in." Relative to the thinning of the cider with water after it was taken upstairs for sale, this same witness testified as follows: "When fellows came in there drunk, I would give them water instead of cider." Q. "Then they came in drunk? A. Yes, sir." Q. "Why did you thin it down? A. Well, they had all they ought to have had." Q. "You knew the cider was intoxicating? A. No, I didn't know it was intoxicating." Q. "Why did you thin it down then? A. Just because, I don't know why, I said I don't know why."

It was shown from the evidence, and the court so found, that, for a period of 14 or 15 years, appellant sold this cider product in his place of business; that the place where he operated his business sustained a reputation as a place where intoxicating liquor was possessed and sold and as a place where people resorted for the purpose of drinking intoxicating

liquor. There was ample evidence to sustain the finding of the court that, prior to the search by the sheriff, appellant operated and maintained a nuisance within the meaning of the act of 1925, *supra*. The question, therefore, is whether appellant abated the nuisance in such a manner as to preclude this action.

The court found that, not later than July 10, after the search by the sheriff on June 30, 1928, appellant returned the syrup to the fruit juice company and poured out the remaining cider product then on hand, and, since that date, has not manufactured or sold any further amount of said cider product. It will be noted that nothing is said as to a good-faith abatement by appellant, but, on the contrary, in finding of fact No. 11, the court found: *"That the cause of the cessation of the manufacturing of said cider product by the defendant was due directly and immediately to the search of the premises occupied by the defendant by the sheriff of Marshall County, Indiana, on the 30th day of June, 1928."* Appellant set up in answer to this action the proposition of a good-faith abatement, and this finding, well supported by the evidence, is a finding against him on his answer. In other words, the court has found that there was not a good-faith abatement, and that the abatement was the result of the sheriff's search.

Appellant cites the case of *People* v. *Goddard* (1920), 47 Cal. App. 730, 191 Pac. 1012. In that case, however, it was shown that defendant and his agents, after reading in a newspaper of an affidavit charging the premises *rented* by defendant were used for an unlawful purpose, notified the parties to vacate, which was *done immediately,* and the prosecutor was so notified and advised. This case is not in point, as the nuisance was shown to have been abated by the parties *themselves.* It is also well to note that the Supreme Court of California, in denying a rehearing on this case, said: "A

majority of the justices not having assented to the granting of a rehearing of the . . . cause in this court after decision by the District Court of Appeal . . ., it is deemed proper to say that the view of those opposed to the granting of such petition is that the District Court of Appeal opinion recognizes that a *mere sham abatement of the nuisance prior to the action would not be a defense,* and that, in so far as this feature of the case is concerned, the reversal was for want of evidence to sustain the finding of lack of good faith, and that upon the face of the opinion no error appears in that regard." (Our italics.)

*Shore* v. *United States* (1922), 282 Fed. 857, is also cited. There, the court stated that: "If the transgressions have ceased before the bill is filed and before proceedings are instituted, and if it appears that they will not be repeated, injunctional relief will not be granted. . . . Hence, in the present instance, if the parties who have maintained their premises as a nuisance, ceased violating the law, prior to the institution of any suit, injunctional relief should have been denied." The court, however, affirmed the judgment below and held that a nuisance existed (as this was merely a question of time as to when the nuisance existed), stating that *"the presumption that a condition once shown to exist will be presumed to continue, and this presumption applies to nuisances."* (Our italics.)

In the case of *United States* v. *Margolis* (1923), 289 Fed. 161, both of the cases above referred to were taken up and discussed. In discussing these cases and stating the law on the subject of abatement, the court here stated, at page 164: "In this behalf, *People* v. *Goddard,* 47 Cal. App. 730, 191 Pac. 1012 and *Shore* v. *United States,* 282 Fed. 857, are cited. These cases hold that: 'Where a nuisance, to abate *which* an action has been commenced, has been abated or suppressed *by the par-*

*ties themselves,* prior to the commencement of the action, the further prosecution of the action cannot be maintained, and the action should be dismissed, for the very obvious reason that there is then nothing existing against or upon which the injunctive process of the court can or will operate.' *People* v. *Goddard,* 47 Cal. App. 730, 191 Pac. 1012. A rehearing of this decision was denied by the Supreme Court of California, that court saying, however, . . . that a majority of the justices recognized that 'a mere sham abatement of the nuisance prior to action would not be a defense.' The case was reversed for a new trial upon the question of good faith.

"The first authority cited in the *Goddard Case* in support of the declaration of law quoted is Joyce, Nuisances §486, p. 704. The language of that text is that 'a nuisance will not, it is decided, be enjoined after it has been voluntarily abated.' The distinction between the instant case and those cited is not only patent but potent. Here there was and is no voluntary abatement of any sort. . . . The abatement had, if one actually has been had . . . is due not to his own voluntary act, but solely to *vis major.* Under such circumstances, this court is not required to stultify itself, and because of an assumed change of heart on the part of the defendant and through a failure to take advantage of appropriate injuctive process, thereby actually pave the way for a further debauchery of the law in the guise and under the asserted protection of the practice of religion. Courts having to do with similar controversies, and similar bland and childlike defenses, have not hesitated to adopt a contrary course.

"The Supreme Court of Iowa, in which jurisdiction they have an abatement law not dissimilar to the one under consideration, has had occasion several times to construe the law and apply it to situations similar to

that involved herein. In *Judge* v. *Kribs*, 71 Iowa 183, 32 N. W. 324, 325, the court said: 'The several defendants were witnesses in their own behalf, and severally testified, with more or less directness, that they, after notice of the hearing for the allowance of a temporary injunction was served on them, had quit the business, and, as one of them stated, he had "reformed." . . . So here it appears from the evidence that the defendants were engaged in selling intoxicating liquors contrary to law, and kept and maintained a building for that purpose. Upon being advised that an effort was about to be made to vindicate the law, they suddenly reformed and quit the business. It appears to us that there is great reason to suppose such a reformation is not in good faith, etc.'

"The same court, in *Tutle* v. *Bunting*, 147 Iowa 153, 125 N. W. 844, in disposing of a similar contention, based upon somewhat similar facts, said: 'Defendants complain of the decree of permanent injunction and also of the order for the abatement of the nuisance. . . . The distinction between these cases is that, in one class, the trial court was of the opinion that defendants, had, in good faith, gone out of business, and did not intend to again re-engage in it at the place in question or at any other place; while, in the other class, although the defendants had ceased the business and professed reformation, the brief time elapsing after the reformation and before trial or other circumstances disclosed were deemed insufficient proof of such repentance as to secure defendants immunity from an injunctional order. The question, after all, is largely one of good faith. . . . If, on the other hand, *there be doubt as to the defendant's good faith or a question about their repentance, the order will issue* to assist in removing the temptation to return to old habits.' (Our italics.)

"In *Donnelly* v. *Smith*, 128 Iowa 257, 103 N. W. 776,

the same court, in a somewhat similar contingency, said: 'Should we concede that, before the hearing for the writ, the defendant had brought the conduct of his business into conformity with law, this could avail him nothing. One who has been engaged in the traffic in intoxicating liquors in open violation of law cannot avoid an injunction by simply making profession of a change of heart and a swift change in existing conditions. Common experience has led to the conclusion that in all such cases the effort to reform should be given substantial aid in the way of a temporary writ.'

"It is obvious, of course, that the same reason would apply and similar justification would exist for the issuance of a permanent writ, such as is here under consideration."

In *State* v. *Hunphrey* (1917), 94 Wash. 599, 162 Pac. 983, in affirming a judgment closing a house of prostitution, wherein a suit had been commenced sometime after the last visit of the police officers, that court said: "Attention is called to the fact that the language of the first section quoted is in the present tense—that the action may be begun 'whenever a nuisance exists'—and it is argued that since the nuisance ceased at the time of the last arrest, no nuisance existed at the time the action was begun some time later, and hence no action would lie. But we think this contention not justified. . . . The cause of abatement was the activity of the police officers. . . . The state has the right to resort to all remedies afforded to make the cessation perpetual. Since, therefore, the action was necessary to arouse the owners to activity, we think the court was justified in imposing the penalties the remedy afforded."

The Iowa Supreme Court, in *State* v. *Seipes* (1927), 202 Iowa 1119, 211 N. W. 719, said: "All the cases emphasize the necessity for the abatement to be in good faith and voluntary to justify the refusal of the court

to enjoin the continuance of the nuisance. We are aware of no case holding that the seizure or destruction of intoxicating liquors . . . by officers engaged in the enforcement of the law is such an abatement of the nuisance as will justify the refusal of an injunction. In *State* v. *Ralph,* 184 Iowa 28, 168 N. W. 259, where liquor was seized before the petition for injunction was filed, we said it did not necessarily follow that the alleged nuisance had been abated."

In the case at bar, the trial court had before it an answer to the charge against appellant, which answer alleged that the nuisance had been abated. The court has found, and we cannot disturb such finding where there is evidence to support it, that there had been no such good-faith abatement, but, rather, the cessation was due to the activity of the sheriff. As above stated, as to appellant's attempted abatement, quoting from *United States* v. *Margolis, supra,* "this could avail him nothing."

We desire to call attention to the fact that the judiciary of other states has held that the question as to whether the abatement was voluntary and in good-faith rests in the sound discretion of the trial court, and the finding is not to be disturbed on appeal unless there appears an abuse of discretion. *Barber* v. *Buonanne* (1917), 179 Iowa 642, 161 N. W. 688; *State* v. *Seipes, supra; State* v. *Johnson* (1927), 204 Iowa 150, 214 N. W. 594; *State* v. *Marker* (1929), 208 Iowa 1001, 224 N. W. 588.

The evidence strongly tended to prove that appellant and his servants knew that intoxicating liquor was being sold for many years. Nor were the sales discontinued until appellant heard that the cider contained more than the lawful amount of alcohol— then, and only then, did he stop the selling of the cider, which leads to a reasonable conclusion, which the court

found, that he stopped the sales because of the search by the sheriff. This finding, being against appellant on his contention that there was a previous abatement by him, and the finding being supported by the evidence, such finding, in effect, decides against appellant on his evidence, and such finding cannot be disturbed on appeal.

We hold the finding to be supported by the evidence, that the conclusions of law follow the finding, and the judgment is in conformity with the conclusions of law.

Judgment affirmed.